**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

JAMES LANIGAN[1]                                                                PLAINTIFF

v.                                    Case No. 4:09CV00300 JLH

DASSAULT FALCON JET CORPORATION                                    DEFENDANT

## OPINION AND ORDER

James Lanigan commenced this action on April 22, 2009, alleging race discrimination in violation of his rights under 42 U.S.C. § 1981 and Title VII, 42 U.S.C. § 2000 *et seq.*, and seeking relief against Dassault Falcon Jet Corporation for wrongful termination. The defendant has filed a motion for summary judgment, and the plaintiff has responded. For the following reasons, the defendant's motion for summary judgment is granted.

## I.

James Lanigan, an African American, began working for Dassault as a cabinet fabricator on March 3, 1997. As a fabricator, Lanigan reported directly to a lead, who reported to a manager. Brent Johnson was Lanigan's lead from 2002 until 2005, and Gary Coffman was Lanigan's manager from 2000 to 2005. During his tenure, Lanigan also worked under John Gentry.

On his first day at Dassault, Lanigan went through an employee orientation concerning the fabricator position, the materials used on the job, and the expectations of the job. Lanigan also received an employee handbook containing Dassault's Standards of Conduct.[2] The Standards of

---

[1] The complaint identified the plaintiff as James Lanige but the parties agree that the plaintiff's name is James Lanigan. The Clerk is directed to correct the docket accordingly.

[2] He received an updated employee handbook in 2002.

Conduct categorize offenses into four categories (A through D)[3] and outline a four-step progressive disciplinary system: verbal warning, written warning, suspension, and termination.  The seriousness of an offense dictates which step of the disciplinary process may be utilized first.[4]  The timing of subsequent offenses determines whether discipline progresses to the next step: if it has been a year or more since the previous discipline, then a supervisor may only counsel the employee rather than utilize the next disciplinary step.  The Standards of Conduct also state that the general disciplinary actions listed are to be used as a guide and that Dassault has the discretion to take the appropriate disciplinary action in each instance.

When a fabricator receives an assignment or "operation" from his lead, the lead tells him the "time budget" allocated for the operation, or the amount of time within which that operation must be completed.  A fabricator is responsible for determining the work that needs to be done in order to complete the operation within the allotted time budget. After receiving an operation, the fabricator clocks onto that operation by entering his employee number and the operation number into the computer.  When the fabricator is finished working on an operation, he must clock off of that operation in order to stop time from being assessed to that operation.  Failure to clock on and off operations properly results in hours being assessed on the wrong operations and can cause an operation to run over the time budget.  At various times, all fabricators run over the time budgets when performing jobs.  If the failure to meet time budgets becomes constant, then the fabricator is

_____

[3] Wasting time, material, and supplies is a Category A or B offense.

[4] Category A offenses generally result in progressive discipline that begins with a verbal warning for the first offense, whereas Category B offenses begin with a written warning. Category C offenses begin with suspension without pay, and Category D offenses result in termination for a first offense.

disciplined. Subsequent failures to meet the time budgets result in progressive discipline under the Standards of Conduct.

In June 2002, John Gentry conducted a performance evaluation on Lanigan and determined that he was too frequently over time budget on operations and needed to improve his speed. Specifically, Gentry wrote that Lanigan needed to demonstrate "significant improvement over the next 60 days." (Def.'s Ex. 10.) In August 2002, Lanigan received another performance evaluation, which indicated that his work was "acceptable" or "exceeds acceptable" in all categories. Gentry's typewritten comments stated that Lanigan had improved his speed to meet time budgets.

In March 2003, Lanigan received another evaluation, this time from Gary Coffman. Coffman indicated that Lanigan needed to increase his production and that his "output [was] marginal at best." (Def.'s Ex. 12.) In January 2004, management subtracted time from Lanigan's operations because Lanigan failed to clock on and off of operations properly. As a result, on January 13, 2004, Lanigan received a verbal warning. On February 3, 2004, Lanigan received a written warning for going over the time budget on at least two operations because he did not clock on or off of the operations properly. In a February 2004 performance review, Brent Johnson marked Lanigan as "needing improvement" in the areas of work output, attendance, and dependability. Johnson noted that, given Lanigan's experience, he "should be producing at a much higher rate." (Def.'s Ex. 14.) Johnson also noted that Lanigan needed to "make sure . . . [to] clock on and off of [his] jobs correctly, because this is a very important part in making the budget." (*Id.*)

In April 2004, Lanigan was suspended for three days without pay for exceeding time budgets on three operations and for failing to clock on or off of operations properly. Brent Johnson noted that Lanigan spent 9.41 hours on a task which should have taken 4 hours and 23 hours on an

operation that had a time budget of 12 hours.  Lanigan also contributed to an overcharge of time on a third operation.  When Lanigan was suspended, he was also given a verbal warning to improve his attendance.  In January 2005, Lanigan received a written warning for excessive absenteeism.

On Lanigan's March 2005 performance evaluation, Brent Johnson marked Lanigan as "needing improvement" in the area of work output and "unsatisfactory" in the area of attendance. Johnson also commented that Lanigan's production needed "to be improved immediately due to the tight schedules and flow reductions that [Dassault] has this year."  (Def.'s Ex. 17.)

On April 22, 2005, Lanigan was terminated for continuing to exceed time budgets on operations.  In the disciplinary action form, Brent Johnson noted that Lanigan charged 58.05 hours on an operation with a time budget of 48 hours and 60.72 hours on an operation with a time budget of 50 hours.  Johnson also wrote, "There is no reason other than you not working at a fast enough pace for these projects to be over budget.  Due to this you are once again in violation of Employee Handbook Standards of Conduct Category A, item # 14, wasting time, material [and] supplies.  Due to no signs of improvement in your production and following the company's progressive discipline procedure, your employment is being terminated."  (Def.'s Ex. 18.)  Lanigan did not file any charges with the Equal Employment Opportunity Commission ("EEOC") following his termination.

Lanigan specifically names two Caucasian fabricators at Dassault who also exceeded time budgets but were not terminated for it.  In July 2003, fabricator Roger Hartman received a performance evaluation indicating that his work output was "needing improvement" and his attendance was "unsatisfactory."  In January 2004, Hartman was given a verbal warning for careless mistakes that caused two operations to go over budget.  On April 16, 2004, Hartman received a written warning for going over budget on three more operations "due to careless mistakes and slow

4

work habits." (Def.'s Ex. 19.)  Brent Johnson wrote, "Drastic improvement in your production is needed at this point, and if improvement is not made immediately, additional disciplinary action will be taken, up to and including termination." (*Id.*)  In July 2004, Hartman's annual performance evaluation revealed that he was "needing improvement" in the area of work output.  Coffman wrote, "You make to [sic] many mistakes and your projects run over budget.  You need to make every effort to be here everyday and pay attention to your project to eliminate your mistakes and increase your production." (*Id.*)

On April 19, 2005, over a year after receiving the previous written warning, Hartman received another written warning for going over budget on operations.  On May 17, 2005, Hartman received a three-day suspension without pay for going over budget on three operations.  According to the disciplinary action form, Hartman charged 15 hours on two separate operations that had time budgets of 12 hours and had to rework part of one operation because of mistakes that he had made.  In June 2005, Hartman took a medical leave of absence.  His employment was terminated when he was not able to return to work at the expiration of his medical leave.  (Def.'s Ex. 19.)

Richard Beirne, a Caucasian cabinet fabricator, also exceeded time budgets.  In his July 2003 performance evaluation, Beirne was marked as "needing improvement" in the area of work output.  His evaluator wrote, "You need to work more efficient [sic] and increase your production." (Def.'s Ex. 20.)  In March 2004, Beirne was given a verbal warning for exceeding time budgets.  In June 2004, he was given a written warning for poor work performance that caused two operations to go over budget.  It appears that Beirne's output improved somewhat after he received the written warning.  In both his November 2004 and October 2005 annual performance reviews, Beirne's work output was considered "acceptable."  In the November 2004 review, his evaluator noted that most

of Beirne's projects came it "right at budget or slightly over." (*Id.*)  No further disciplinary actions were taken against Beirne.

## III.

A court should enter summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986).  When a nonmoving party cannot make an adequate showing on a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  The moving party bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553.  If the moving party meets this burden, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56(e)).  A genuine issue for trial exists only if there is sufficient evidence to allow a jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511.  In deciding a motion for summary judgment, the Court views the facts in the light most favorable to the nonmoving party and draws all inferences in his favor, mindful that summary judgment seldom should be granted in discrimination cases where claims are often based on inferences. *Peterson v. Scott County*, 406 F.3d 515, 520 (8th Cir. 2005); *Bassett v. City of Minneapolis*, 211 F.3d 1097, 1099 (8th Cir. 2000) (collecting cases). *But see Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 762 (8th Cir. 2004) (Arnold, J., dissenting).

**IV.**

Lanigan asserts claims for relief pursuant to both 42 U.S.C. § 1981 and Title VII, 42 U.S.C. § 2000 *et seq.*.  Generally, Title VII claims and section 1981 claims are analyzed under the same standard.  However, Title VII imposes one prerequisite that section 1981 does not.  Title VII "establishes an administrative procedure which a complaining employee must follow before filing a lawsuit in federal court." *Williams v. Little Rock Mun. Water Works*, 21 F.3d 218, 222 (8th Cir. 1994).  Before filing a complaint in federal court, an individual must (1) timely file a charge of discrimination with the EEOC and (2) receive notice of the right to sue.  42 U.S.C. § 2000e-5(b), (c), (e).  A plaintiff's failure to file a charge with the EEOC precludes him from filing a lawsuit under Title VII.  *Crawford v. Boone County, Mo.*, 175 F.3d 1023, 1023 (8th Cir. 1999).  Because Lanigan failed to file a discrimination charge with the EEOC, summary judgment is appropriate on his Title VII claim.  *Id.*

**V.**

In analyzing Lanigan's section 1981 claim, the Court uses the familiar *McDonnell Douglas* burden-shifting framework. *See Putnam v. Unity Health Sys.*, 348 F.3d 732, 735 n.2 (8th Cir. 2003) (applying *McDonnell Douglas* to a section 1981 claim).  The plaintiff must first establish a prima facie case of discrimination.  To establish a prima facie case of discrimination, the plaintiff must show that (1) he is a member of a protected class, (2) he was meeting his employer's legitimate job expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees outside the protected class were treated differently.  *Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 864 (8th Cir. 2008) (citing *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 616 (8th Cir. 2007)).  If the employee establishes a prima facie case, then the burden shifts to the employer to

articulate a legitimate, non-discriminatory reason for the adverse action, meaning that the presumption of unlawful discrimination disappears. *Carraher v. Target Corp.*, 503 F.3d 714, 716 (8th Cir. 2007) (citing *Thomas v. Corwin*, 483 F.3d 516, 529 (8th Cir. 2007)). If the employer provides such a reason, the plaintiff must then show that the proffered reason is a pretext for the unlawful discrimination. *Id.* Where an employee is unable to show pretext, summary judgment is appropriate. *Pierce v. Marsh*, 859 F.2d 601, 604 (8th Cir. 1988).

Without contesting the first and third elements of the prima facie case, Dassault argues that Lanigan was not meeting its legitimate expectations and that, even if he was, there are no similarly situated Caucasian employees who were treated differently than Lanigan.

Dassault argues that Lanigan was not meeting its expectations primarily because of his poor productivity, which is the reason Dassault proffers for ultimately terminating Lanigan's employment. (Def.'s Br. 14.) To establish a prima facie case of discrimination, Lanigan is not required to disprove Dassault's reason for firing him. *See Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010). If he were, the *McDonnell Douglas* burden-shifting analysis would collapse into this element of the prima facie case. *Id.*; *see also Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 944 (8th Cir. 1994) ("[B]y requiring plaintiff to disprove the alleged conduct violations in order to establish his prima facie case, the district court essentially required plaintiff, at the outset, to disprove defendant's alleged business reasons for its adverse employment action—in other words, to prove pretext and the ultimate issue of intentional discrimination. The prima facie burden is not so onerous."). Thus, Lanigan can establish that he was meeting his employer's legitimate expectations if, setting aside Dassault's reasons for firing him, he was *otherwise* qualified for his position. *Lake*, 596 F.3d at 874. At the time of his termination, Lanigan had worked for Dassault as a fabricator for

eight years.   On Lanigan's annual performance evaluations, he was commended as a cooperative employee with much experience.   (Def.'s Exs. 10-12, 14, 17.)   His primary shortcoming and the alleged reason for his termination was his poor productivity.   Although Lanigan was ultimately terminated for poor productivity, he was otherwise qualified for his position as a cabinet fabricator.

Dassault also argues that Lanigan has failed to establish the fourth prong of his prima facie case because there are no similarly situated Caucasian employees who were treated differently from the plaintiff.   At the prima facie stage of the analysis, the standard for determining whether employees are similarly situated is a "low threshold" and merely requires that the employees "are involved in or accused of the same or similar conduct and are disciplined in different ways." *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 851-52 (8th Cir. 2005); *see also Wimbley v. Cashion*, 588 F.3d 959, 962 (8th Cir. 2009) (applying the low-threshold standard in light of the Eighth Circuit's analysis in *Rodgers*).   Here, Lanigan contends that both Hartman and Beirne were similarly situated to him: they reported to the same supervisors, and they overran time budgets.   Unlike Lanigan, however, neither Hartman nor Beirne went through the three steps of the progressive discipline system preceding termination and continued to perform poorly thereafter.   Although Hartman received a verbal warning, two written warnings, and a three-day suspension for failing to meet time budgets, he went on medical leave shortly after receiving the suspension and remained on medical leave until it expired and his employment was terminated.   Beirne only received a verbal warning and a written warning before his productivity improved; as a result, Beirne was never suspended or terminated.   In contrast, after Lanigan received a verbal warning, written warning, and three-day suspension, his productivity still did not improve.   Even after his suspension, Lanigan charged 58.05 hours on an operation with a time budget of 48 hours and 60.72 hours on an operation with a time

budget of 50 hours.  Because Lanigan continued to perform poorly even following his suspension, Lanigan is not similarly situated to Hartman or Beirne.

Even if Lanigan had satisfied his initial burden under the *McDonnell-Douglas* framework, he has not provided sufficient evidence of pretext.  Dassault has articulated a legitimate, nondiscriminatory reason for terminating Lanigan's employment: his poor productivity.[4]  Thus, the burden returns to Lanigan to show that this proffered reason for terminating him is pretext for discrimination.  At this stage, the test for determining whether Lanigan is similarly situated to any of the Caucasian cabinet fabricators is rigorous.  *Wimbley*, 588 F.3d at 962; *Rodgers*, 417 F.3d at 853.  Lanigan must show that he and the other fabricators are similarly situated "in all relevant aspects." *Wimbley*, 588 F.3d at 962.  "To be probative evidence of pretext, the misconduct of the more leniently disciplined employees must be of comparable seriousness."  *Rodgers*, 417 F.3d at 853.  Here, Lanigan cannot prove that the misconduct of Hartman or Beirne were of comparable seriousness.  Unlike Lanigan, Beirne was never suspended for poor productivity, and in fact, on his 2004 and 2005 annual reviews, his work output was marked as "satisfactory."  Although Hartman was suspended for poor productivity, he went on medical leave within weeks after his suspension and never returned to work for Dassault.  Lanigan has presented no evidence of a Caucasian employee who went through all three steps of the progressive discipline system but was not discharged after failing to improve.

---

[4] According to Lanigan's disciplinary action form, he  "continuously overr[a]n projects, even though all parts, work instructions and tools required to perform the task [were] available." (Def.'s Ex. 18.)

Based on this evidence, a reasonable jury cannot find that Dassault's stated reasons for firing Lanigan are pretext for discrimination, and Dassault is entitled to summary judgment on Lanigan's section 1981 claim.

## CONCLUSION

Because Lanigan did not file a race discrimination claim with the EEOC, the defendant is entitled to summary judgment on Lanigan's Title VII claim.   The defendant is also entitled to summary judgment on Lanigan's section 1981 claim because Lanigan has failed to produced evidence sufficient to raise a genuine issue of material fact as to whether he was subjected to race discrimination when his employment with Dassault was terminated.  For these reasons, Dassault's motion for summary judgment is GRANTED. Document #10.

IT IS SO ORDERED this 5th day of April, 2010.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE